Good morning, and welcome to the Eleventh Circuit. Just a couple of housekeeping notes before we start. You will see that Judge Newsom and I have Judge Anderson with us this morning for the first case, and so because of the panel change, Judge Lagoa will come back for the remaining three cases. We'll take a recess after the first case so that we can get Judge Anderson on his way, and then we'll resume with Judge Lagoa. The other thing is we have our traffic light system, which I think has been explained to you for timing oral argument. The light will be green until you have two minutes remaining in your allotted time, at which point it will turn yellow. When the light turns red, please conclude your remarks quickly, the exception being if you're answering our questions, then you may continue and finish your answer. All right. So, with that, I'll call the first case, which is number 23-11683, Okeelanta Corporation et al. v. United States Army Corps of Engineers. Mr. Clement. Thank you, Your Honors. May it please the Court, Paul Clement for the appellants, and I'm going to endeavor to save three minutes for rebuttal. The Corps' decision here violates two separate statutory limits. First and foremost, the decision brazenly ignores WERDA's savings clause and the Corps' own implementing regulations. Both the statute and the regulations make clear that the proper baseline for judging whether implementation of the Comprehensive Everglades Restoration Plan results in a loss of water for existing users is the quantity and quality of water available on the date of enactment, December 11, 2000, or what the regulations call the pre-SERP baseline. Can I ask you just a quick question, I guess, first about the statute? I guess one reading of this is that maybe there's a trigger for the savings clause, and that the trigger is that there's water lost as a result of implementation of the plan, and then subsequently, and if that trigger is triggered, then subsequently but separately, then there's this baseline question. But if we don't get through the trigger because there is no water lost as a result of the implementation of the plan, then do we even talk about the baseline? You would, because you need to look at the baseline to determine whether or not there is water lost as a result of the implementation of the plan. And that's what the Corps' own regulations say. The regulations say the way we figure out whether there's water lost as a result of implementation of the plan is to compare the waters that will be available after this particular project is implemented, and compare it to the pre-SERP baseline, which is specifically defined in the regulations as the hydrological conditions on December 11, 2000. But, sir, I guess just for the time being, setting the regulations aside, because I agree with you that the regulations, I think, are pretty favorable to your position, but setting the regulations aside just for the moment, wouldn't just sort of the more ordinary understanding of water lost as a result of implementation of the plan be sort of an ex-ante, ex-post comparison of pre-plan, post-plan? No. No. I mean, and again, I would say you might think if you didn't have the language about, in the statute, about the date of enactment of WERDA 2000, you might think it was a comparison between immediately preceding conditions and immediately post conditions. Importantly, though, even if that were the case, you'd still get to the baseline in the savings clause, because the stand-alone operation of the STA is going to deprive my clients of 160,000 acre-feet of water every year it operates on its own. Now, the Corps is going to tell you they haven't given the last permit for that, but I wouldn't be distracted by that, because this thing is going to be ready for operation for about a decade before the rest of ours is in operation. The state of Florida said there's an emergency where they need the treatment facility to go into operation. So, you know, if we're going to talk about what's practically likely, the STA will go into operation. As soon as that goes into operation, we're going to lose 160,000 acre-feet of water, so you'd have to get to the savings clause, you'd have to get to the right baseline. The other thing I would emphasize, because my friends on the other side think that that language about water loss as a result of implementation of the plan helps them, but I don't think it does, because it does focus on water loss as a result of implementation of the plan, not the project at issue. And so, because it focuses on water loss as a result of everything the Corps does to implement the plan, and the plan was authorized in 2000, that implementation of the plan language, and not project, which is used elsewhere in Word of 2000, that's another signal that you go back to 2000, and that's the statutory baseline. And the other clue that I think is quite profound here is that if Congress intended that baseline to be adjusted over time, I think there'd be something in the statute that tells you how do you go about doing that. I mean, the guidance, the draft guidance that's never been finalized, that they essentially rely on here, talks about non-intervening SERP events. You'll look at Word of 2000 in vain for those words or any other words that tells the Corps or anyone else, here's how we change the baseline over time, and that would be a pretty glaring omission if the baseline were supposed to change over time. But if the baseline is supposed to be the same, December 11, 2000, then you wouldn't expect there to be anything in the statute that tells you how to change the baseline. And here, if you use the right baseline, December 11, 2000, I think it's more or less conceded that implementation of the plan is going to leave us in a deficit vis-a-vis that 2000 baseline. So I'd like to understand how you get from implementation of the plan to telescoping the entirety of everything the Corps has done with respect to the plan as opposed to the particular project or operation being challenged. I'd say the natural reading of that is that the Savings Clause is triggered only when there is, I'm quoting now from the statute, water to be lost as a result of the implementation of the plan. I see what you've done, your answer to Judge Newsom, you tried to change implementation of a plan from the project being challenged to everything the Corps has ever done about the plan. Well, Judge Anderson, we went either way. I think we have the better reading because it does say implementation of the plan and it doesn't say implementation of the project. And if you look at Word of 2000, a couple of sections before that, it talks about what has to be put in a project implementation or a project review. And so Congress knows how to use the word project and it knows how to focus on just what's in a particular project and the effect of a particular project. And in the Savings Clause, both with respect to water rights and flood protection, it uses the formulation implementation of the plan. So we think it takes everything into account. We think that has to be the right result because think about this, these Savings Clause analyses are necessarily projections. So you can imagine a situation where the first project, the Corps has a rosy scenario and says this is actually going to give everybody a surplus of 200,000 acre feet of water. And then that doesn't materialize and, in fact, it costs my client 200,000 acre feet of water. When they do the next implementation of the plan, they trigger their obligation to do a Savings Clause. And if that next implementation of the plan is going to save us, let's say, 100,000 acre feet of water, we would say that's not enough. That's not what the statute says. And it's not what the regs say. They say you have to give us what we had in 2000 before you can continue to implement the plan. I understand your position and we'll certainly ask the Corps' attorney how they respond to that. But I'm thinking thus far that with Judge Newsom, the ordinary meaning of the word cause is that the challenged project caused a loss of water, i.e., you compare it to what the water supply was immediately prior to the implementation of that project. Now, I do agree with you, however, that we do get to the baseline even if that position is true because of the stand-alone operation of the STA. In that regard, the District Court found that in adopting Laws 2008, the Corps lowered the lake level because of a concern, and I'm quoting from the District Court now at page 27, quote, might break and put in harm nearby residents. And at page 28, the District Court is describing what the Corps found in Laws 2008 saying, and I'm quoting now from the District Court at page 28, the Corps determined that under the then current regulation, WSE, the likelihood of the dam or the dike breaking in a high water event was 55 percent. So number one, I do not see in your briefs or the briefs of the other two plaintiffs any challenge to those findings of fact that the Corps made in Laws 2008 and that the District Court accepted. Am I correct in that regard? So we're not here, you are correct Judge Anderson, we're not here challenging Laws 2008 as advertised as a temporary reduction of the lake levels in order to fix the dike. We were told it was going to be temporary, we want the dike fixed just like the next people, but the air creeps in when they make it permanent by putting it into the baseline. And so they could have done this temporary fix as long as they kept WSE as the baseline for purposes of evaluating projects, because WSE is what gave water rights in December 11, 2000. The error here is not that they temporarily tried to fix the dike and lowered the lake levels. All right, let me, I'm assuming for this question only that the panel agrees with the causation kind of position that Judge Newsom spelled out, namely that unless there is a loss of water caused by the project, it doesn't apply at all, but stand-alone operation of STA is going to cause a loss, therefore we have to reach the baseline issue. And it seems to me that your language about the baseline, if that replacement clause, replacement obligation is triggered, the statute pretty clearly ties it to 2000, but if it is impossible, factually, to maintain that lake level, it seems to me that the absurdity and possibility doctrine does come into play like the district court suggested. In other words, if certainly the court cannot fill the lake beyond its capacity. So it seems to me that there is a factual impossibility that unless these repairs did improve that capacity, the baseline would probably be lowered to the extent of the capacity of the system. What's wrong with that? Several things, Your Honor. I mean, first of all, even if the district court did all of that, that would create a huge Chenery problem, because the analysis of the agency here is not that the proper baseline is 2000, but we find impossibility. They make the whole problem go away by picking the wrong baseline and ignoring the statutory baseline. I understand that, but the district court did exactly what I'm suggesting. Yes, and that's a Chenery violation for him to do that, because that's a rationale for their decision that the agency itself didn't embody in the decision that we challenged. But it's also wrong. I mean, I don't know what my friend will come up here and say, but I don't think they're going to take the position that it's absolutely impossible to comply with the savings clause. The dike has been fixed. So the crisis that precipitated Lourdes 2008 is over. So what you're saying is the district court was wrong when it said that the court in Lourdes 2008 determined that the then current regulation schedule, WSE, would likely create a 55% risk of breaching the dike? Without the dike being fixed, and that's why it's a temporary lowering to fix the dike. Now the dike is fixed. And I don't think the court can come up here and tell you, if they go back to WSE as the schedule, that that is impossible or going to create flood problems. And one of the things, and I know I'm into my additional time, but I want to be clear. When we talk about lake levels, we're trying to do that in order to simplify this a little bit. But, you know, it's not like 18.53 is carved into the side of Lake Okeechobee. I mean, that's just a way of trying to illustrate that under WSE, we were entitled to water rights to draw from the lake under a schedule that had a maximum elevation of 18.53. Lourdes 2008 lowered that level to 17.25. And I think it's common ground between the parties that that results in about a 500,000 acre feet of water loss for purposes of the baseline. And so if you go back to the right baseline, and then you say, well, we're going to lose 160,000 feet of water in this first phase of the project, I don't think they're going to tell you it's impossible. I mean, all of these water rights are highly engineered. Well, they say in their brief that the new regulation schedule, which would replace Lourdes 2008, which in turn replaced WSE, will not that process in determining that new regulation schedule after the repairs, will that not tell us whether or not, in fact, the capacity of the lake has been improved? I don't think it will, Judge Anderson, because the Corps is going to take the position, I'm going to get up here, that the LOSM, the new schedule, is a non-SERP event, so they don't have to do savings clause analysis at all. Well, they have conceded on remand, they conceded in the district court that a savings clause analysis has got to be done on the standalone operation of the SDA, if it is operated at all. With respect, I think you're conflating the EIS or the NEPA analysis with the savings clause analysis. They conceded both, I believe, and we'll be sure. But, in all events, they would have to do that before it becomes operational. Yes. And I don't think they intend to do that. All that has to happen before this becomes operational is for the Clean Water Act permit to issue, and that is not a demanding step, and there's a lot of pressure for them to do this. And I think they're going to take the position up here, but I could be wrong, that they're done with the savings clause analysis, and if I could just finish by, I know you've built in this premise that we have only the causation, but with all due respect, that reads the words on the date of enactment out of the statute, and I just don't think you can do that. I don't think you can effectively substitute for $2,000 a baseline of the conditions immediately before this particular project is implemented. Can I ask you, I know that we're holding you beyond your time, but can I ask you a couple of questions about the regulations?  So when the regulations, when it defines the pre-cert baseline as the hydrologic conditions in the South Florida ecosystem on the date of enactment of WERDA, what does that mean exactly, hydrologic conditions? Does that necessarily mean same quantity? So I think it uses the hydrologic conditions as a way of measuring the quantity that would I think the reason it talks about hydrological conditions, and this is where maybe some confusion has crept in in the briefing, is, you know, we talk about 18.53 because that's just a number that shows how we lose water between 2000 and 2008, but in reality, the way these water schedules work is like, if you're in a drought condition, everybody gets less water. If you're in a surplus condition, everybody gets more water. What the Corps envisioned in its regulations is it would put together a definitive pre-cert baseline that would take into account hydrological conditions and years of data such that you would know, essentially, that if you're in a four-year drought, you get this much water, or if you're in a surplus situation, you get this much water. That's why this... So wait, so wait, so are you saying that the pre-cert baseline changes depending on whether they're drought conditions or flood conditions? No, the baseline stays the same, but the practical entitlements to water of agriculture, of urban users and the Everglades, everybody's going to get less water in a drought, even based on the baseline, even based on a fixed baseline. So the whole drought deluge, it's all kind of a red herring, I think, at the end of the day, and the real question about intervening non-SERP events, whatever that means, is whether the Corps itself can take some action, not nature, but the Corps itself can take some action, label it an intervening non-SERP event, radically reduce the water available to my clients, and then just say when it does the savings clause, we're effectively taking that off the books because we're going to build that into the baseline. That's where we're getting robbed of our water, and there's just nothing in the statute that says that the Corps has the discretion to sort of say, well, this is a SERP project, this is an intervening non-SERP project, you just lost 500,000 acres, feet of water, and that our intervening non-SERP event, too bad, too sad. That just can't be, if that were the deal, there would have been no deal in 2000. Certainly, however, the integrity problems of the dike were not planned action, was it? No, as long as it's temporary, I think, but where it becomes permanent is when they build it into the baseline, and so I think it's useful to sort of think about what would have happened if the Corps, you know, the Corps is not good with deadlines, but if they actually stuck to the three-year plan for lowering the lake and fixing the dike and then raising it back up, if there were a project that were in the second year of those three years, I think the right way for people to approach that would have been just to ignore LORS 2008. So that's just temporary, that's going to come and go, we're going to sort of figure out what's post-project water, ignoring LORS, and we're going to compare it to the baseline, ignoring LORS, and everything works fine, and that's, again, why the Corps itself did no Savings Clause analysis for LORS 2008. We didn't rush into court to challenge that as a deprivation of our rights under the Savings Clause because we were told it was temporary, and I think the sin is not, and this is where the District Court, I think, got off the rails a little bit. He sort of thought we should have challenged LORS 2008, and the point at which our ox is gored is the point at which the Corps takes that temporary measure and bakes it into the permanent baseline. Okay, sorry, one more. I know that you're at the podium representing multiple growers, but it seemed to me that different growers had different ideas, perhaps, about what the remedy ought to be. Can you explain to me, I guess, both for your client, technically, and for the clients you're representing at the podium, what you think the remedy is? Because I guess I took you as sugar to be asking for a vacature of the entire thing, and if that's true, I wonder if you're actually getting less water. We're not getting less water if we get vacature. At least, we don't think we will get less water, and I think this is where the idea is, the way we understand the savings clause is it's sort of an action-forcing event, and you can analogize it to something to say, like, we have certain entitlements before anybody gets anything else, and I don't mean that collaterally, because I think everybody will draw equally based on their rights if there's a drought and all that, but what I mean to say is, like the hypo we used in the brief, if we have an entitlement to 100 bucks before anybody else gets paid, and the Corps is saying, we're going to give everybody 50, that deprives us of our rights immediately, because we're supposed to get 100 before anybody else gets paid. Now, we might be in the short run worse off $50 if we challenge that, but the idea is, the planned projects aren't going to go away, and the way this is actually supposed to work, and this is another thing to keep in mind, the savings clause is not a dead end. It's not like, oh, well, there's a savings clause violation, so you can't proceed. The savings clause then triggers the Corps' obligation to try to find additional replacement water, and all of this is highly engineered, so that's not like a pie in the sky stuff. They can turn off different dikes and levers, and they can come up with additional water for us, and so just to get to the remedy question, I don't really think there's any difference on my clients. I just think, and the confusion creeps in when we say, we don't have a problem with the reservoir. We really don't even have a problem with the STA. What we have a problem with is that going into effect without our savings clause rights being respected, and the most obvious way to respect our savings clause rights is to find additional water, use the right baseline, find additional water to make up for the $160,000 that we're going to lose, plus whatever we sort of think we're losing by shifting the baseline, and then we're all hunky-dory with the project. It's just that we're not hunky-dory with the project if it proceeds in violation of the savings clause and makes permanent a deprivation of our rights. We understand your argument. Thank you. Thank you, Your Honor. We'll give you your full three minutes for rebuttal. Ms. Jeffries. Good morning, and may it please the Court. Ariel Moran Jeffries on behalf of the federal government. Across the board, plaintiffs' arguments in this case run counter to precedent and plaintiffs'. I'll start where we left off on remedy. Plaintiffs' asserted injury is a complete mismatch for the relief that they seek. They claim to want greater protection for water supply, but they ask this Court to set aside the Corps' approval of a project that adds 78 billion gallons of new water. A win for plaintiffs would mean that no one would benefit from the project. Well, Mr. Clement, of course, says, sure, for a minute, but then you will snap into action and he will win in the end. I think that is total speculation on plaintiffs' part and breaks down their standing theory. It is speculation to suggest that if the Corps is blocked from taking this action, that it will proceed with a better project or any project at all that will improve water to a greater degree. That's because plaintiffs have no substantive legal entitlement to the particular amounts of water supply. So they cannot guarantee that the Corps will better protect their water if the project is vacated. All they can hope to do is roll the dice and block this action and that in blocking this action, it will come out at the end of the process with a greater benefit. But there's no reason for this Court to allow that kind of gambit. I think maybe breaking down what might happen theoretically and, you know, plaintiffs have the burden of showing standing and haven't really theorized what they think. I think you're now talking about standing. Is that right? It seems to me that in the standing analysis, we are supposed to assume the legal arguments and factual arguments of the plaintiffs. And it seems to me you're just conflating the merits with standing. It seems to me clearly if, let's take, for example, the standalone operation of the STA, if that happens without the reservoir making up for losses, there's going to be a loss of water, interpreting it the Newsom way of actual causation as compared to what it was immediately before. And the trigger is going to come into effect. And that's clearly standing. I'd like to shift you to, it seems to me that just assume for this argument that we have agreed thus far with what Newsom and I have been suggesting about actual causation. But if the standalone operation of the STA does cause an actual loss of water, then the replacement obligation will be triggered. And I cannot find in my mind or research any way to get around the 2000 baseline unless it is the absurdity, impossibility theory, doctrine that the district court suggested. You don't even talk about that. But is that not true? How else would you get around the 2000 baseline? Well, so I think that this court doesn't need to get into that, whether you look at it through the lens of standing or whether you look at it through the lens of the merits, because the simple facts on the ground right now is that no standalone operations are authorized. What plaintiffs are challenging here is the combined operation that will eventually happen. They are also challenging the, especially the O.K. Atlanta plaintiffs also challenge the standalone operation of the STA as a violation of the savings clause. So just accept that for this purposes of this question anyway. Do we not have to insist on maybe order on remand that the savings clause analysis be conducted or you never operate standalone? I'm not sure, A, how this court could do that, because there is no approval of the standalone operations. So unless I'm... Certainly, it's the record shows it contemplated. The record shows that it may be after there's been a savings clause analysis, after there's been a NEPA analysis, after the project operating manual has been updated, after state permits have been received, after federal permits have been modified, like we are nowhere close to reaching a point where standalone... Well, for purposes of this question, assume you're wrong on that and assume that we do get to the baseline issue and have to address it. Assume also that we agree with you that it can, and with the district court, that it non-SERP actions like the integrity problems of the dike, but if those repairs did reestablish the previous capacity of the dike and the system, would that baseline not also increase? Another part of the question, the repairs have been done. Have they restored capacity? And if they do, will not the regulation schedule that you're contemplating, you say you're finalizing it, will that not reflect that? And should not, the basic question, should not any increase in the capacity of the system over and above LORS 2008, should that not also rise up the baseline? Two points on that. As a factual matter, that regulation schedule actually has been issued about two months ago. That's called LOSSM, and it did not increase the maximum elevation of the lake. It's still 17.25 in that schedule. So I suppose the first line answer... The new regulation schedule actually determined the capacity and determined that it had not increased above the 17.25. Well, that moves that issue then. Unless they challenge that, which they certainly can. There was a public notice and comment, so they had input, and they can challenge that. Yes. I'd like to turn a little bit to the merits now and talk specifically about first the tax, and then I'll get into the regulations. First, on the merits, plaintiffs cannot show that any water has been lost as a result of implementation of the plan. Judge Newsom, to your point, the trigger has not been operated yet, and so we don't get into these questions of the baseline. Will you answer Mr. Clement's answer to me, which is there's a difference between project and plan? I don't really understand that theory, frankly. Plan is defined. It's a defined term in the statute. It's defined as the Comprehensive Everglades Restoration Plan, as it was thought of in the re-study in the Yellow Book. So essentially, that composes 68 particular projects that were approved. And so the plan is the projects. I don't think there's really any... Or I guess the project is part of a larger plan. Sure, but here there's no question that the operating system manuals are not a part of the plan. Other projects might be a part of the plan, but they aren't saying that any other project that is a part of the cert plan has actually affected it. So it's really just a red herring. Plaintiffs put substantial weight on this language, date of enactment, but the phrase simply can't bear the weight that they put on it. To start, plaintiffs confuse, as you mentioned, the Savings Clause prohibition with its condition. In other words, the Savings Clause prohibits the Corps from eliminating or transferring sources of water until it can replace them with water of comparable... Do you acknowledge, I guess, on what Judge Anderson has called the Newsom interpretation, that if the trigger is triggered, as I said, such that there is a loss of water as a result of the implementation of the blank project plan, whatever, we'll bracket that for the time being, that then the baseline is 2,000? Yes and no, depending on what exactly you mean by that. Let me explain how date of enactment, the baseline, and the condition are in our theory. So on our theory, the Savings Clause fits together neatly such that the date of enactment sets a ceiling for water that must be replaced and the lost as a result language sets the floor. In other words, if the project causes a loss of water, the Corps must make up for that loss. But if water supply increases after 2,000, then the Corps needs only replace up to the quantity of water existing on the date of enactment. That's why both of those words, lost as a result of implementation of the plan and the date of enactment language, is there. That ensures that existing users are not adversely affected by CERP projects, while also requiring that only quantity up to 2,000 levels needs to be replaced. That interpretation, I think, makes both the most sense of the text of the Savings Clause and the context of WERDA 2000 as a whole. The statute as a whole, when we think about it, approved a framework for a massive Everglades restoration plan. Its primary purpose was ecosystem restoration. Reading the Savings Clause, as we have, comports with that overall context, while also ensuring that water users are not adversely affected. Plaintiff's interpretation, on the other hand, would place agricultural needs above ecosystem restoration. The exception would simply swallow the rule if there were a provision that required the Corps to first prioritize building an insurance policy for industry before providing ecosystem benefits. And on plaintiff's theory, it wouldn't matter why the water supplies were lower. The federal government would first need to restore agricultural water supply, even if the project did not cause the reduction, which is contrary to both the text of the Act and the context of what Congress was trying to achieve in CERP. So let me ask you this, and I'm sorry, I'm just trying to, like, catch up to the way you described your theory of how the date of enactment language interacts with what I've been calling the trigger. Is the reason that you think that if there is, in fact, water lost as a result of the implementation of the plan, the trigger is operationalized, that you don't automatically bounce back to the date of enactment, 2020 quantity. Is the word available what allows you to do that? I mean, so, you know, it says, until a new source of water supply, comparable quantity and quality, is that available on the date of enactment of this Act is available. So are you saying that you just need to show that there's this much water available to replace, and then you have to replace the water lost? You don't have to go sort of back to the full quantity? It's got to be there in theory, but you don't have to get there in practice. Is that your position? No, our position is that that effectuates the meaning of lost as a result of implementation. I get that. And so it exists in two parts. And maybe one way to think about this, the guidance documents, which I realize are not enacted, but they have... Yeah, and can you explain to me what has happened since 2007? I was a young man in 2007. I mean, the events in the course of my own life since 2007, it's just shocking to me that somebody hasn't put signature to paper to finalize this thing. Can you explain what has happened? I don't have any additional details. So it's just bureaucratic loss? It wouldn't be the first time. Boy, that's not a very good defense. Fortunately for us... So I guess what you're saying is like the government doesn't know what happened. Fortunately for us, the guidance does not matter in this case. Our argument is based on the plain text. The only reason I'm pointing to the guidance here is it explains the way the Corps is thinking about this. It sets out a flowchart that could be helpful to the Corps in understanding the way this is thought about. At step one of the flowchart, you look at whether you compare to the existing conditions baseline. So the first question to ask is, does this project cause a reduction? I think it's 794 of the JIF. That's helpful. The first question that the Corps runs in its analysis, compared to existing conditions, is there water loss as a result of implementation of the plan? Question two, compared to the pre-SERP baseline. That's when the question comes in about water levels of 2,000. So is this causing a reduction? And then if it is, then the question is, how much water needs to be replaced? And that's where the 2,000 level comes in, in the pre-SERP baseline. The problem here is we never got there in the analysis because there's no water lost as a result of implementation of this plan. I cannot see any way that your interpretation is faithful to the language of the statute itself when you say this baseline of the year 2,000 operates only as this ceiling. But this factor does lend some support to that. The fact that because the savings clause is not triggered at all, unless the project that is challenged actually causes a loss of water, as compared to right before that project, because of that, all the Corps has to do in order to never trigger the savings clause is, before the savings clause analysis is conducted, to find water and make sure that you never do an action that actually causes water. In other words, in this particular case, we think, I think, that the standalone operation of the SDA will, if you don't add some water to this standalone project, it's going to trigger the savings clause. And therefore, it seems to me, make your replacement obligation back to the year 2,000 baseline. But you can avoid that by simply getting some more water, assuming you can do that, and adding that to the standalone project, which means that you never get to the replacement obligation, which triggers the year 2,000 baseline. Do you understand what I'm talking about? I think the only question this Court needs to answer is whether there's been water lost as a result of implementation of the plan. It does not need to get to the baseline. But to your point about the Court needs to provide this water first on plaintiff's theory, I think if plaintiffs are correct that the Court must make up for any reductions in agricultural water supply before proceeding with a CERT project, then the Court will need to find some way to add, on their theory, 500,000 acre-feet of water that plaintiff's claim was lost since 2000 before building the reservoir and treatment area. I don't know how plaintiffs theorize that they will get there, which I think is a standing problem, but even setting that aside, perhaps plaintiffs believe that the Court could accomplish this by building a second $4 billion reservoir the size of Manhattan Island, but I think that's rather unlikely. That would require Congress to pass a new statute authorizing that plan. In that sense, plaintiffs' theory— That, to my mind, that's getting to the absurdity and possibility doctrine. Right, well, it's just not as simple as opening some levers and finding 500,000 acre-feet of lost water before proceeding with this plan. It's possible, and though plaintiffs haven't really developed this theory, that they believe the Court could use its authority under the Flood Control Act, which is the statutory authority it has to set these regulation schedules, to change the regulation schedule, to raise lake levels, but then, I mean, from a standing perspective, that is brown to a T, and so they wouldn't have standing to argue that. But the fundamental problem for them, both on standing and the merits, is that they have simply not hypothesized any path that provides them the relief that they desire, whether that's through the existing statute or otherwise. Can I ask you—so we've been talking about the face of the statute, but the programmatic regulations do, I think at least on one reading, effectively embody their theory of the statute, and so what's your response to the regulations? I mean, you know, defining the pre-cert baseline by reference to date of enactment. I think that the problem with the regulation theory is that plaintiffs don't finish reading the sentence that they quote. The sentence says, if implementation of the project shall cause a cause, right, so the regulations think that the question is whether it causes an elimination or transfer, and then getting further, by comparing the availability of water with a recommended project with the but it continues, the pre-cert baseline developed in accordance with 385.35. Yes, yeah, so I mean, this is part of the reason that I asked you about what happened in 2007, because do I understand correctly that the in accordance with 385.35a, that is the regulation that says, hey, develop some guidance documents, which just inexplicably you never did. The guidance, to be clear, were developed, they were just never issued, and I— I mean, if a tree falls in the middle of the forest and no one's around to hear it. I do think it matters, though, because then you turn to Section C of 385.36. It says, until guidance is issued, issues involving legal sources of water should be resolved on a case-by-case basis, considering all factors that can be identified as relevant to decisions under the savings clause. So that is the standard that plaintiffs need to meet, not this manufactured comparison to the definition of the pre-cert baseline that doesn't exist. I guess my concern, and this is why—maybe I've just sort of got this burr in my saddle, but my concern about the failure to finalize 2007 is that it sort of allows you to just sort of not do what the regulations, you know, indicate you ought to do, which is to develop a guidance that everyone can rely on, and instead to fall back on this kind of gestalt-y totality of the circumstances thing, like, oh, until we get around to signing that piece of paper, it's not quite a blank check, but I agree with you that Sub C basically says, like, yeah, just look at everything that seems relevant to you. And that's just—how long is that sustainable for, like, the government simply not to know why we haven't put signature to paper on the real guidance document? And so in the meantime, for the last umpteen thousand years, we just get to kind of do the totality of the circumstances thing. I think that is just of some concern to me. It feels like—it feels kind of blank check-ish. Two points on that, Your Honor. First, barring any sort of statutory or constitutional constraint, the government is free to proceed on a case-by-case basis, and plaintiffs haven't pointed to any constraint there. The second point is even looking at the—any constraints the regulations place, that sentence that I was reading earlier in A continues even past that. So the question is, the pre-cert baseline develops in accordance with this guidance and by using other appropriate information. So even on the plaintext of the regulations, even if you want to apply A as opposed to C—and I would posit that C is the correct provision to apply—even if you apply A, the Corps is free to apply other appropriate information. And that exactly models what the Corps has done in the regulations, what it's done in the guidance, and what it did here. Because the first step is determining, like you say, whether that trigger is met, whether there has been an elimination or transfer. The second step is that pre-cert baseline. So the Corps is free to rely on other appropriate information to ensure that the statutory text, the savings clause, which is what is really governing our analysis here, that they are implementing that properly. And they have done so, is what I would say. The problem I see with your answer just now, going to the case-by-case, is that the case-by-case cannot, it seems to me, without some legal rationale, ignore the regulation. And the regulation says, just like plaintiffs say, that you determine cause in the first place, not by comparing what water you have after the project to what was there before, but compare it to 2000 baseline. That's what the regulation says. And I don't see how case-by-case or guidance, guidance memo could depart from that without revising the regulation. So the regulation says, compare it with a pre-cert baseline and any additional information. Any additional information can include the existing conditions to determine whether that first set is triggered, and then compare it to the pre-cert baseline. You get that and other information out of 35A? Yeah, that's what plaintiffs don't quote when they quote compared to the pre-cert baseline. And then B explains that the guidance memorandum shall also describe the process for comparing the recommended project with the pre-cert baseline. So the idea is that the Corps will develop this guidance to determine the process for comparing it to the pre-cert baseline, to develop a pre-cert baseline. Until that happens, you go to C, until the guidance is issued, the Corps does it on a case-by-case basis, which is what they've done here. And what they've done is consistent with the guidance, the regulations, and the statute. And frankly, all this Corps needs to do is ensure that it's consistent with the statute here. Thank you. Thank you. Just a few quick points in rebuttal. First, let me start with the Newsom theory, or the idea that the trigger is project-specific rather than looking at the implementation of the plan. I think there's three reasons why. It is not the implementation of a project. Is that not also an implementation of the plan? It is an aspect of implementation of the plan, but the plan is bigger. As my friend told you, the plan consists of 68 different projects. And Congress knew how to focus the agency on project-specific issues. If you look at the subsection immediately before the Savings Clause, the Savings Clause is sub 5. Sub 4 is project-specific assurances. Little a says, or big A, says project implementation reports. And it tells the Corps all the things it's supposed to look at for a particular project at the project level. And it distinguishes project-specific, that's sub 4, with sub 5 in the Savings Clause. And both flood protection and agricultural and urban users and all the other users is triggered to implementation of the plan. There's a second reason that's important, that's correct, because that's consistent with the regs. And no other provision is consistent with the regs. And Congress told the agency that it had to promulgate regs. That's the one thing it did in a reasonably timely fashion. 2003, I'm not here to tell you that Chevron's alive and well, but I will say, even under Skidmore, you're entitled to look at the Corps' own contemporary understanding, which I think 2003 is pretty good. And it says, no, you look at the whole thing. And here's the third reason why I think you have to look at plan, not project. Because otherwise, the government can have adverse possession of our water. Because as I said, here, they took 50,000 acre feet of our water, and their theory is they build that into the baseline and they never have to give it back. That seems crazy to me. And it has nothing to do with whether it's project implementation or not, or how you think about plan implementation, rather, or not, and how you think about that. It seems Judge Newsom was worried about how you get around the language of this regulation, which does support your position. Seems to me you get around it the same way. The statute is factually impossible. Therefore, the absurdity and possibility doctrine means that you can't do precisely what the statute wanted, and you can't do precisely what the regulation said. Judge Newsom, they're not up here telling you this is an impossibility case. You keep bringing that up, and they keep saying, well, that's not exactly right. And that brings me to sort of the Chenery point, which is, if they'd said the right baseline is 2,000, but we can't comply with it, it's just not feasible. First of all, that wouldn't explain why they're going to go forward with the STA alone. Because one way that's feasible to give us some relief and makes the standing issue go is they could say, well, we've got a real problem with the baseline, so the one thing we can't do is let the STA go into operation before the reservoir goes into operation. We're going to have to hold that off and wait for 10 years for that. That would at least give us 160 or prevent us from losing another 160 acre-feet of water, and there's nothing impossible about that. But the broader point is, this case can be quite simple for this court. They picked the wrong baseline. They did not use the baseline in their analysis, as Congress told them, which is 2,000. Anything else they might come up with, that's taken care of by Chenery. Make them go back, use the right baseline, and if they have another theory as to why they don't have to give us full relief, then we can challenge that in due course. Can I ask you just briefly to respond to her point in response to my question about the regulations that they sort of go on beyond pre-cert baseline to say, like, yeah, that and other information, or I'm just paraphrasing. Sure, but the thing that's critical and why we stop where we do is because those regs still say, kind of first question, the trigger questions, we have to figure out a loss. How do we figure out whether there's a loss of water? We do it by comparing status after this project is implemented. The regs actually say project, not plan, which is a little bit of a problem, but whatever. You look at the world after the project is implemented, and you compare it to the pre-cert baseline, there's nothing in the rest of those regulations that talks about non-intervening CERP events and the idea that they get to take 500,000 acres of our water and never give it back. Nothing in the rest of that regs does it, and so the regs, the relevant portion of the regs tells you that the right way to think about a trigger is implementation of the whole plan, not just the project, and the other aspect of the regs that nothing else in those regs, case-by-case, whatever, like case-by-case analysis, once you use the right baseline, maybe it's valid, maybe it's not, but when out of the box they say 2008, not 2000, that's just inconsistent with the statute. You should vacate it, and if they want to come back and tell you it's impossible, they want to come back and tell you, all right, well, there's only so much we can do here, let them, but don't let them get away with picking the wrong baseline, and just one last point, LOSM does not moot this controversy in any way, shape, or form. It just makes permanent the stealing of our water. They've now made clear they're never going back unless we make them use the right baseline. Thank you, Your Honors. Thank you. Court is in recess.